IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MOHAMAD SHEBLEY, et al., )<br>)<br>  Plaintiffs, )<br>)<br>  v. )<br>)<br>UNITED CONTINENTAL HOLDINGS, )<br>INC., et al., )<br>)<br>  Defendants. ) | No. 17-cv-01906<br><br>Judge Andrea R. Wood |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Mohamad and Eaman Shebley (together, the "Shebleys"[1]), a Lebanese-American couple, were passengers on a flight operated by Defendant SkyWest Airlines, Inc. ("SkyWest") from Chicago to Washington, D.C. After an issue regarding their child's booster seat arose during boarding, the Shebleys and their children were removed from the flight. The Shebleys subsequently sued Defendants United Airlines, Inc. ("United"), United Continental Holdings, Inc. ("UCH"), and SkyWest for violating 42 U.S.C. § 1981, which prohibits racial discrimination in the making and forming of contracts. Now before the Court are two motions for summary judgment—one filed by SkyWest (Dkt. No. 157) and the other by UCH and United (Dkt. No. 162). For the reasons stated below, both motions are granted.

## BACKGROUND

For purposes of a summary judgment motion, the Court views all evidence and inferences "in the light most favorable to the nonmoving party." *Scott v. Edinburg*, 346 F.3d 752, 755 (7th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) and *Balderston v.*

---

[1] When referring to them as a couple, the Court uses the term "the Shebleys." When pertaining to them individually, the Court refers specifically to Mohamad or Eaman.

*Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003)). Here, this means that the Court resolves factual disputes between the parties in favor of the Shebleys as nonmovants. However, before the non-moving party "can benefit from a favorable view of the evidence, [they] must first actually place evidence before the court[]." *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010).

The facts summarized below are undisputed unless otherwise noted.[2]

On March 20, 2016, the Shebleys and their three children boarded Flight 5811 from Chicago-O'Hare International Airport to Washington D.C. (Pls.' Resp. to SkyWest's Statement of Facts ("PRSSF") ¶ 5, Dkt. No. 169.) The Shebleys are Lebanese-American. (*Id.* ¶ 1.) The Shebleys and their children were flying to Washington D.C. as a spring break trip. (*Id.* ¶ 6.) On the flight, Eaman wore a hijab and Mohamad a beard. (Defs.' Resp. to Pls.' Statement of Additional Facts ("DRPSF") ¶ 5, Dkt. No. 178.)

SkyWest operated the Shebleys' flight.[3] (Pls.' Resp. to United's Statement of Facts ("PRUSF") ¶ 5, Dkt. No. 170.) SkyWest is a commercial air carrier that employs pilots and flight attendants who operate its flights. (PRSSF ¶ 2.) The Shebleys' flight was operated by Captain Matthew Wagener, First Officer Jonathan Moore, Flight Attendant Errol Agcaoili, and Flight

---

[2] In their responses to Defendants' statements of fact, the Shebleys often purport to contest facts without citing particular parts of the record, as required by Federal Rule of Civil Procedure 56(c) and Local Rule 56.1. (*See, e.g.*, Pls.' Resp. to SkyWest's Statement of Facts ("PRSSF") ¶¶ 18–20, 34; Pls.' Resp. to United's Statement of Facts ("PRUSF") ¶ 5.) Where, in response to a summary judgment motion, a party fails to dispute a fact by citing record evidence, the Court considers the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2).

[3] The Shebleys dispute this fact, also arguing that Defendants' Affidavit of Thomas D. Campuzano in cannot be viewed as evidence without further documents to support or corroborate it. (PRSSF ¶ 5, Dkt. No. 169.) But an affidavit on its own is considered evidence at the summary judgment stage. *See, e.g.*, *Rooni v. Biser*, 742 F.3d 737, 740 (7th Cir. 2014) ("One acceptable type of evidence is the plaintiff's own affidavit, as long as it otherwise contains information that would be admissible if he were testifying directly."). And Campuzano's affidavit supports SkyWest's statement that it operated the flight; meanwhile, the Shebleys offer no evidence to counter this statement of fact.

Attendant Alicia Hayes. (PRUSF ¶ 5.) SkyWest trained all those employees. (*Id.*) Further, United is a commercial air carrier that has contracted with SkyWest to operate certain regional domestic flights. (*Id.* ¶ 2.) United is owned by parent holding company UCH. (*Id.* ¶ 3.)

During boarding, Mohamad encountered Flight Attendant ("FA") Agcaoili. (DRPSF ¶ 11.) According to Mohamad, during their first interaction, he asked FA Agcaoili to hold his cup of coffee while he unloaded his family's bags. (*Id.*) Mohamad states that FA Agcaoili held his cup and proceeded to look the Shebleys up and down. (*Id.*) Defendants, however, deny that this encounter ever occurred and claim that FA Agcaoili's first interaction with Mohamad regarded infant seatbelts. (*Id.*) Once the Shebleys boarded, they sat in their assigned seats: Eaman sat in 16D with the couple's three-year-old child next to her in 16C; Mohamad sat in 16B across the aisle; and the couple's two remaining children sat in row 12. (PRSSF ¶ 7.) The Shebleys' child in 16C sat in a booster seat they had brought for her. (DRPSF ¶ 15.)

Later during pre-departure, Mohamad asked FA Agcaoili whether the airline would provide an over-the-shoulder harness for his young daughter in 16C. (*Id.* ¶ 12.) According to the Shebleys, FA Agcaoili responded that there was no such thing as an infant seatbelt, causing Mohamad to show him a webpage for United on the availability of infant seatbelts. (*Id.*) At this point, FA Agcaoili sought out Captain Wagener to confirm his position on the infant seatbelts. (*Id.* ¶ 14.) He learned from Captain Wagener that no such seatbelts were available on the flight. (*Id.*) When FA Agcaoili relayed this information to Mohamad, Mohamad again offered to show FA Agcaoili his phone. (*Id.*) According to the Shebleys, FA Agcaoili waved over FA Hayes. But Defendants dispute much of this account, denying that FA Agcaoili ever responded that infant seatbelts do not exist, that Mohamad showed FA Agcaoili a website that indicated infant seatbelts

3

were available on United flights, that Mohamad showed FA Agcaoili this website multiple times, and that FA Agcaoili waved over FA Hayes. (*Id.* ¶¶ 12, 14.)

When FA Hayes approached the Shebleys and realized that their daughter in 16C was seated in a booster seat, she told Eaman to remove the booster seat. (*Id.* ¶ 15.) Eaman responded by asking FA Hayes if it was safer for her child to sit on the booster seat without an infant seatbelt than to sit directly on the plane seat. (*Id.*) According to SkyWest, FA Hayes did not answer her question and, instead, repeated that Eaman must remove the booster seat. (PRSSF ¶ 16; Def. SkyWest's Statement of Facts ("DSSF"), Ex. 2, Mohamad Shebley Dep. Tr. at 36:17–24, 37:1–24, Dkt. No. 159-2.) Eaman again asked about her daughter's safety with a booster seat versus without, to which FA Hayes responded that she must remove the booster seat. (PRSSF ¶ 17; Ex. 2, Mohamad Shebley Dep. Tr. at 36:17–24, 37:1–24.)[4]

At this point, FA Agcaoili offered the Shebleys an alternate flight. (PRSSF ¶ 18.) The Shebleys began to yell and argue in response. (*Id.* ¶ 19.) FA Agcaoili and FA Hayes then left the Shebleys to speak with Captain Wagener. (*Id.* ¶ 20.) Once the flight attendants walked away, the Shebleys removed the child's booster seat. (*Id.* ¶ 21.) In the meantime, FA Agcaoili and FA Hayes informed Captain Wagener about their interactions with the Shebleys, explaining that they were being combative and hostile and refusing to listen. (*Id.* ¶ 24.) While the Shebleys deny that they were combative or hostile or refused to listen to the flight attendants at any point, they do not deny that the flight attendants made these assertions to Captain Wagener. (*Id.*)

---

[4] Though the Shebleys deny that FA Hayes instructed her to remove the booster seat three times (PRSSF ¶¶ 16–17), the evidence the Shebleys cite indicates that FA Hayes did indeed repeat her directions three times. (*See* Mohamad Shebley Dep. Tr. at 36:17–24, 37:1–24 ("She immediately said to remove the booster seat . . . . She repeated to remove the booster seat. . . . [My wife] asked if it was safer to seat our child without a booster and without the over the shoulder straps. . . . I believe she repeated the same thing, to remove the booster seat . . . .").) As a result, the Court finds no dispute on this point.

4

SkyWest flight attendants are trained to assess the level of threat that disruptive passengers present and to notify the captain of disturbances during boarding. (*Id.* ¶ 22.) The captain is responsible for the safe operation of a flight and makes the decision to remove a passenger. (*Id.* ¶¶ 25, 27.) After hearing from FA Agcaoili and FA Hayes, Captain Wagener instructed First Officer Moore to coordinate ground personnel—namely, United (PRUSF ¶ 16)—for removal of the Shebleys. (PRSSF ¶ 22.) There was no discussion with ground personnel about removing the Shebleys; at this point, Captain Wagener had already made his decision. (DRPSF ¶¶ 26–27.) Before his decision to have the Shebleys removed, Captain Wagener had neither seen nor heard the Shebleys' interactions with the flight attendants. (PRSSF ¶ 31.) He could not identify the Shebleys in any way, nor was he aware of their religion or national origin. (*Id.* ¶¶ 32–33.) Further, the flight attendants never communicated the Shebleys' race, religion, cultural background, ethnicity, or nationality to Captain Wagener. (*Id.* ¶¶ 31–34.)

After some time, a United customer service agent approached the Shebleys and told them that their family needed to exit the plane. (DRPSF ¶ 30.) The customer service agent stated that someone would explain the situation once the Shebleys deplaned, but that the decision was that of Captain Wagener. (*Id.* ¶ 31.) The Shebleys asked why they were being removed. (*Id.*) Ultimately, they deplaned and were escorted by United employee Brian Dalton to another airplane leaving for Washington D.C. where they sat in first class. (*Id.* ¶ 47.)

According to SkyWest, there was no mention of the Shebleys' religion, cultural background, ethnicity, nationality, or race from the time of boarding until the Shebleys were removed. (PRSSF ¶ 34.)

5

**DISCUSSION**

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, even after all reasonable inferences are drawn in the nonmovant's favor. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011). While the Court construes all facts and reasonable inferences in the light most favorable to the nonmovant, "favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013). For example, "the mere existence of some alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment." *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1032 (7th Cir. 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)).

The Shebleys' original complaint included claims under the Airline Deregulation Act ("ADA"), 49 U.S.C. § 40101, *et seq.*; 42 U.S.C. § 1981; and Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d, *et seq.* (Compl., Dkt. No. 1.) On Defendants' motion to dismiss the original complaint, the Court dismissed the ADA claim with prejudice, dismissed the Title VI claim without prejudice, and denied Defendants' motion to dismiss the § 1981 claim. (1/16/19 Mem. Op. and Order, Dkt. No. 76.) The Shebleys subsequently filed their First Amended Complaint ("FAC"), which contained a claim under § 1981 and a revised Title VI claim. (FAC, Dkt. No. 86.) Defendants filed a motion to dismiss the FAC and the Court dismissed the Shebleys' Title VI claim, leaving only the § 1981 claim for racial discrimination. (5/31/20 Mem. Op. and Order, Dkt. No. 126.)

6

Pursuant to § 1981, the Shebleys claim that they were unlawfully discriminated against on the basis of race when they were removed from the flight. Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a). The phrase "mak[ing] and enforc[ing]" as defined here includes the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b). To establish a claim under § 1981, plaintiffs must prove that (1) they are members of a racial minority; (2) the defendant had an intent to discriminate on the basis of race, and (3) the discrimination concerned the making and enforcing of a contract. *Morris v. Off. Max, Inc.*, 89 F.3d 411, 413 (7th Cir. 1996).

I. **SkyWest's Motion for Summary Judgment**

SkyWest moves for summary judgment on the grounds that the Shebleys have not presented sufficient evidence from which a reasonable factfinder could conclude that SkyWest discriminated against them on the basis of their race. In assessing § 1981 claims, this Court must consider "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The Court considers the evidence as a whole, "rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Id.*

Nonetheless, plaintiffs still frequently utilize the familiar burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to show that there is sufficient evidence to survive summary judgment. The *McDonnell Douglas* framework is sometimes referred to as the "indirect" method. But the Seventh Circuit has been critical of the

7

"direct" versus "indirect" terminology, insofar as it previously led courts improperly to sort evidence into "different piles, labeled 'direct' and 'indirect,' that are evaluated differently." *Ortiz*, 834 F.3d at 766. Nonetheless, the Seventh Circuit continues to recognize the *McDonnell Douglas* framework as "one way of culling the relevant evidence needed to demonstrate whether a reasonable factfinder could conclude that an employer engaged in an adverse employment action" based on a proscribed factor. *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019) (internal quotation marks omitted). Regardless of whether the evidence is viewed through the burden-shifting framework or simply placed in "a single pile" and "evaluated as a whole," *Ortiz*, 834 F.3d at 766, the Court's sole focus here must be on whether the Shebleys "ha[ve] produced sufficient evidence to support a jury verdict of intentional discrimination," *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). Because the parties analyze the Shebleys' § 1981 claim under the *McDonnell Douglas* framework, the Court starts there.

### A. *McDonnell Douglas*

Under the *McDonnell Douglas* framework, a plaintiff may establish a prima facie case of discrimination with evidence demonstrating that: (1) he is a member of a protected class; (2) his actions were satisfactory; (3) he suffered a materially adverse action; and (4) similarly situated non-protected individuals were treated more favorably. *Huggar v. Nw. Airlines, Inc.*, No. 98 C 594, 1999 WL 59841, at *4 (N.D. Ill. Jan. 27, 1999) (citing *Oates v. Discovery Zone*, 116 F.3d 1161, 1171 (7th Cir. 1997)) (applying *McDonnell Douglas* factors to case involving plaintiff's removal from flight).[5] If the plaintiff satisfies all four elements of his prima facie case, "the

---

[5] Although the *McDonnell Douglas* factors in the employment discrimination context are slightly different, the framework has been applied in non-employment contexts. *See, e.g.*, *Huggar*, 1999 WL 59841, at *4. Further, "the precise requirements of a prima facie [*McDonnell Douglas*] case can vary depending on the

burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse [] action, at which point the burden shifts back to the plaintiff to submit evidence that the [defendant's] explanation is pretextual." *Id.* (internal quotation marks omitted).

The first element of the Shebleys' prima facie case regards whether the Shebleys are members of a protected class, which is not in dispute. The parties agree that the Shebleys are Lebanese-American. (PRSSF ¶ 1.) While the Shebleys do not plead that they are members of any specific race, the Court draws the reasonable inference from their self-identification as Lebanese-American that they are (or were perceived to be) Middle Eastern or Arab. The Seventh Circuit has recognized "Arabs" as a protected class under § 1981. *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 756–57 (7th Cir. 2006).

The next element requires that the Shebleys prove their actions were satisfactory. While *Huggar* does not elaborate on what actions would be satisfactory or unsatisfactory, 1999 WL 59841 at *4, the Shebleys did fail to follow the flight attendants' instructions by not complying with multiple requests to remove the booster seat. (PRSSF ¶¶ 15–17.) Although the Shebleys ultimately removed the booster seat, they only did so after the flight attendants repeated themselves three times and walked away. (*Id.* ¶¶ 20–21.) The Shebleys also yelled and argued with the flight attendants in response to FA Agcaoili offering them an alternate flight. (*Id.* ¶¶ 18–19.) In light of these actions, the Shebleys have not established the second element of a prima facie case.[6] Nonetheless, the Court will proceed with the remainder of the *McDonnell Douglas* analysis, as it will inform the Court's holistic evaluation of the evidence under *Ortiz*.

---

context and were never intended to be rigid, mechanized, or ritualistic." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512 (2002) (internal quotation marks omitted).

[6] A separate case involving a § 1981 claim in the retail transaction context—specifically regarding a restaurant's refusal to sell alcohol to a customer—chose to adopt a different articulation of the second factor in *McDonnell Douglas*: "the plaintiff made himself available to receive and pay for services

9

For the third element of a prima facie case, the parties do not dispute that the Shebleys suffered a materially adverse action by being removed from the flight with their children.

The last element of the Shebleys' prima facie case requires them to present evidence that SkyWest treated similarly situated, non-protected individuals more favorably. The Shebleys do not offer any evidence of other passengers who should have been removed from the flight but were not. Though the Shebleys argue that they were the only individuals instructed to deplane and that there were no other Arab passengers, this does not satisfy the fourth element's requirement for "specific evidence and specific examples" of individuals treated more favorably. *Igasaki v. Ill. Dep't of Fin. & Pro. Reguls.*, No. 15-CV-03693, 2018 WL 4699791, at *5 (N.D. Ill. Sept. 30, 2018). Notably, the Shebleys do not present evidence of any other non-Arab passengers who had a disagreement the flight crew or who otherwise repeatedly challenged the wisdom of an instruction given by the flight crew but were not removed from the flight.

If the Shebleys could establish a prima facie case under the *McDonnell Douglas* framework, the burden would then shift to SkyWest, who can point to a legitimate, nondiscriminatory reason for the Shebleys' removal from the flight: flight safety and passenger noncompliance. The burden would then shift back to the Shebleys to set forth evidence that SkyWest's claimed legitimate, nondiscriminatory reason for removal was actually pretext for discrimination. "Pretext for discrimination means more than an unusual act; it means something worse than a business error; pretext means deceit used to cover one's tracks." *Millbrook v. IBP,*

---

ordinarily provided by the defendant to all members of the public in the manner in which they are ordinarily provided." *O'Neill v. Gourmet Sys. of Minnesota, Inc.*, 213 F. Supp. 2d 1012, 1020 (W.D. Wis. 2002). Though this Court finds the articulation of the second factor in *Huggar* more suitable here, the Shebleys would not have satisfied the second factor as articulated in *O'Neill* either. In particular, under *O'Neill*, the Shebleys had to make themselves available to "receive" services "in the manner in which they [were] ordinarily provided." *Id.* But the basis of the flight attendants' request that the Shebleys remove their child's booster seat was that SkyWest did not ordinarily fly with children in booster seats. For this reason, the analysis of the evidence as to the second *McDonnell Douglas* factor here does not change regardless of which articulation of the second factor the Court applies.

*Inc.*, 280 F.3d 1169, 1175 (7th Cir. 2002) (internal quotation marks omitted). To show pretext, the plaintiff must "identify such weaknesses, implausibilities, inconsistencies, or contradictions in the [defendant's] asserted reason that a reasonable person could find it unworthy of credence." *Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012) (internal quotation marks omitted).

      The Shebleys contend that SkyWest's "shifting or inconsistent explanations" demonstrate pretext. *de Lima Silva v. Dep't of Corr.*, 917 F.3d 546, 563 (7th Cir. 2019). And indeed, pretext can often be inferred from shifting or inconsistent explanations for the challenged adverse action. *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 726 (7th Cir. 2005). But, here, the evidence shows that SkyWest consistently explained that the Shebleys were removed due to a flight safety risk and passenger noncompliance. While the Shebleys contend that SkyWest shifted from not offering any explanation, to telling them that they did not follow crew instructions, to the rationale that they had refused to deplane, various individuals told the Shebleys that they were removed due to the flight safety risk that their noncompliance created. (DRPSF ¶ 32 (employee explains that the Shebleys were removed because they did not comply with crew instructions); *id.* ¶ 38 (Captain Wagener tells the Shebleys for a first time that they are being removed due to flight safety concerns); *id.* ¶ 45 (Captain Wagener tells the Shebleys for a second time that they are being removed for failure to follow instructions).) To be sure, the Shebleys did not comply with the flight attendants' instructions to remove the booster seat when asked; only after the flight attendants left did the Shebleys remove it. (PRSSF ¶ 21.) The undisputed record shows that SkyWest consistently communicated to the Shebleys that their failure to follow instructions created a flight safety issue, so there were no shifting explanations sufficient to support an inference of pretext.

The Shebleys also argue that pretext may be inferred from Captain Wagener not conducting his own investigation after hearing the flight attendants' concerns. The Shebleys contend that, while the captain need not conduct an in-depth investigation, Captain Wagener conducted none at all, relying solely on the flight attendants' statements. However, under § 44902(b), "[t]he Captain (or other decisionmaker) is entitled to accept at face value the representations made to him by other air carrier employees." *Cerqueira v. American Airlines, Inc.*, 520 F.3d 1, 15 (1st Cir. 2008). Captain Wagener did just that. Upon learning from the flight attendants that the Shebleys were not complying with instructions and that they could pose a flight risk, Captain Wagener determined that removing the Shebleys was appropriate. A flight captain need not conduct a "thorough inquiry into the intelligence received." *Williams v. Trans World Airlines*, 509 F.2d 942, 948 (2d Cir. 1975). Additionally, "[e]ven assuming *arguendo* that the flight attendants overreacted in this situation, the captain was entitled to accept at face value the representations made to him by his flight crew." *Shaffy v. United Airlines, Inc.*, 360 F. App'x 729, 730 (9th Cir. 2009). In this way, information Captain Wagener was not aware of or did not verify himself—such as the fact that the Shebleys are Lebanese-American (PRSSF ¶¶ 1, 31–34)—cannot be used to establish pretext of racial discrimination.

Although not explicitly argued by the Shebleys, the Court considered the evidence that FA Agcaoili looked Mohamad up and down during their first interaction as potential evidence of pretext. Given the lack of any other gesture or comment from FA Agcaoili, however, it is difficult to conclude that the fact that he eyed the Shebleys askance (if this dispute is resolved in favor of the Shebleys for purposes of summary judgment) presents sufficient evidence of pretext. This is particular so in the context of a flight crew preparing the cabin for take-off and the concerns about flight safety that were given as legitimate, nondiscriminatory reasons for the Shebleys' removal.

In any case, where a captain decides to refuse transport, "the biases of a non-decisionmaker may not be attributed to the decisionmakers." *Cerqueira*, 520 F.3d at 15. And there is no evidence here that the flight attendants either shared the Shebleys race with Captain Wagener or provided him with false information about what had occurred in the cabin before he made the decision to remove them. Rather, Captain Wagener never saw the Shebleys before making his decision, nor was he informed by others about their race or other identifying characteristics. (PRSSF ¶¶ 31–34.)

Finally, the Shebleys mention the fact that they were given first-class seats on their second flight after their removal. (DRPSF ¶ 47.) While this fact may appear curious given SkyWest's flight-risk rationale, such information does not rise to the level of "deceit used to cover one's tracks," *Millbrook*, 280 F.3d at 1175 (internal quotation marks omitted), or "weaknesses, implausibilities, inconsistencies, or contradictions" such that "a reasonable person could find it unworthy of credence." *Coleman*, 667 F.3d at 852 (internal quotation marks omitted). There are myriad legitimate rationales for placing the Shebleys in first class, such as to monitor the Shebleys or to provide them more comfort so that they would be more inclined to comply with flight instructions. This detail regarding the Shebleys' second flight does not amount to evidence of discriminatory pretext.

In sum, the Court finds that the Shebleys' evidence falls short of what is necessary to permit a reasonable inference of unlawful discrimination under *McDonnell Douglas*. The Shebleys not only fail to satisfy the second and fourth factors to establish a prima facie case, but even if they could establish a prima facie case, the Shebleys lack evidence that could persuade a jury that SkyWest's reasons for their removal were pretext for discrimination.

### B. *Ortiz*

Although the Shebleys fail to defeat summary judgment when evidence is viewed under the *McDonnell Douglas* framework, *Ortiz* recognizes that the evidence viewed as a whole may nonetheless be sufficient to create a jury question. The question for this Court is whether the Shebleys' evidence, viewed in the context of the entire record, could allow a jury to conclude that the Shebleys were removed from the flight because of their race.

Using the *Ortiz* method, the Court does not find enough evidence to support a jury verdict of intentional discrimination. The most convincing pieces of evidence of racial discrimination arguably are (1) AG Agcaoili having looked Mohamad up and down, and (2) the haste with which the flight attendants informed Captain Wagener of a flight safety issue. But, viewing the evidence as a whole, various other facts abate the potential concern of discrimination. For example, FA Hayes asked Eaman three times to remove the booster seat before resorting to speaking with Captain Wagener. (PRSSF ¶¶ 15–17.) And Captain Wagener made his decision to remove the Shebleys without having seen them or knowing anything about their race. (PRSSF ¶¶ 31–34.) Furthermore, § 44902 grants airplane staff the ability to refuse to transport a passenger based on the potential that the passenger "is, or ***might*** be, inimical to safety." 49 U.S.C. § 44902(b). Weighing the evidence as a whole, the Court does not find that the Shebleys have produced enough evidence to support a jury finding of intentional discrimination.[7]

---

[7] SkyWest requests that, instead of applying the *McDonnell Douglas* and *Ortiz* frameworks under § 1981, this Court apply an arbitrary and capricious standard for its review of Captain Wagener's removal decision. SkyWest argues that, pursuant to § 44902(b), an air carrier or captain's discretion regarding removal is "very broad." *Cerqueira v. American Airlines, Inc.*, 520 F.3d 1, 12 (1st Cir. 2008). And at least some courts outside of this Circuit have applied an arbitrary and capricious review standard where a captain has refused transport to a passenger. *See, e.g., Shaffy*, 360 F. App'x at 730; *Cerqueira*, 520 F.3d at 14, 18; *Williams*, 509 F.2d at 948. But courts in this Circuit regularly apply the *McDonnell Douglas* and *Ortiz* frameworks for § 1981 claims. *See, e.g., Zaheer v. United Cont'l Holdings, Inc.*, No. 18 C 6503, 2019 WL 10947352, at *2 (N.D. Ill. Apr. 24, 2019); *Hamilton v. Delta Air Lines Inc.*, No. 17-CV-1725-JPS, 2018 WL 3553380, at *4 (E.D. Wis. July 24, 2018); *Huggar*, 1999 WL 59841 at **3–5. And one of the cases

## II. United and UCH's Motion for Summary Judgment

United and UCH also seek summary judgment based on their argument that neither had any involvement in the decision to remove the Shebleys from the flight; therefore, neither could have racially discriminated against the Shebleys.

### A. United

The Court's finding that, as to SkyWest, the Shebleys have not shown enough evidence for a jury to find racial discrimination is, in part, determinative of United's motion for summary judgment. Under the standards prescribed by *McDonnell Douglas* and *Ortiz*, any of the adverse actions taken as to the Shebleys prior to and inclusive of the removal decision did not result from racial discrimination such that a jury could make that finding. This includes any United actions during this timeframe, of which the Shebleys allege none.

In addition, United was not involved in any actions or decisions until ***after*** Captain Wagener ordered removal. (DRPSF ¶ 26.) Specifically, only after Captain Wagener made his decision about the Shebleys did First Officer Moore coordinate with United ground personnel for the family's removal. (PRSSF ¶¶ 28, 30; PRUSF ¶ 16 ("United ground personnel assist in coordinating the removal of disruptive passengers from the aircraft."); DRPSF ¶¶ 26–27 ("At the time the Captain decided to contact ground personnel, he had already made the decision to remove the Shebleys.") The Shebleys only describe United employees as executing Captain Wagener's decision (*see, e.g.*, DRPSF ¶¶ 30, 43, 47 ("[A] United customer service agent

---

SkyWest cites is particularly out of date. *See Williams*, 509 F.2d 942. Moreover, even if this Court were to apply an arbitrary and capricious standard, it would presumably be arbitrary and capricious for an airline to discriminate on the basis of race. The Court does not understand SkyWest to argue otherwise. After all, transportation regulations state that "[a]n air carrier or foreign air carrier may not subject a person in air transportation to discrimination on the basis of race, color, national origin, religion, sex, or ancestry." 49 U.S.C. § 40127(a). Ultimately, this Court need not reach the issue of whether the arbitrary and capricious standard applies, as the Shebleys have not presented enough evidence for a jury to render a decision finding racial discrimination under the less deferential standard of § 1981.

15

approached Eaman and told her that the family needed to exit the plane . . . .")—not participating in the removal decision itself. Because United employees were not involved in communicating with the SkyWest crew prior to or during Captain Wagener's removal decision, there is no basis from which to conclude that United took any adverse action based on racial discrimination.

Assuming for the sake of argument that the Shebleys did present enough evidence for a jury to find that SkyWest racially discriminated against them, they still have not shown that United controls SkyWest such that it should be liable. The Shebleys suggest that United's contract with SkyWest for SkyWest to operate certain regional domestic flights means that United may have had some control over the flight, its operations, the SkyWest crew, or policies and procedures that were implemented. The Shebleys further argue that United's lack of evidence that it does not have control over SkyWest leans in favor of finding that United may have influenced the removal decision. But United has already set forth evidence that it does not control SkyWest. (Defs.' UCH's and United's Motion for Summ. J., Ex. 6, Affidavit of Thomas D. Campuzano at ¶¶ 12–13, Dkt. No. 92-2 ("United did not own, control, operate or staff the aircraft on which Plaintiffs were removed, nor did United have any operational control over the flight during which the removal occurred. United and SkyWest are two entirely separate corporate entities."); Defs.' UCH's and United's Motion for Summ. J., Ex. 8, Affidavit of Gordon Heward at ¶¶ 12–14, Dkt. No. 92-8 ("SkyWest owned and operated the aircraft for Flight 5811. SkyWest employed the crew of Flight 5811, including the Captain, First Officer and Flight attendants, and SkyWest trained the crew. United did not employ or train the crew. United and SkyWest are two entirely separate and unrelated corporate entities.").) By not presenting any evidence of United's control over SkyWest or the removal decision—and disregarding United's evidence to the contrary—the Shebleys cannot demonstrate that United should be held liable for SkyWest's actions.

As a result, the Shebleys have not offered enough evidence for a jury to find that United racially discriminated against them.

### B. UCH

The Shebleys' argument against UCH relies on UCH being held accountable for United's actions as its subsidiary but, because United was not involved in the removal decision, no such liability transfers to UCH.

Even if the Shebleys' argument against United did survive, the legal separateness of UCH and United prevents UCH from being liable for the actions of its subsidiary. "A parent and a subsidiary are distinct entities with a separate legal existence." *Keilman v. Sam's W., Inc.*, No. 17-CV-03683, 2021 WL 463068, at *8 (N.D. Ill. Feb. 9, 2021) (citing *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001) and *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 944 (7th Cir. 2000) ("[A] parent and a subsidiary are two separate entities and the acts of one cannot be attributed to the other.")). Generally, a parent corporation cannot be held liable for the actions of a subsidiary "unless the legal separateness of parent and subsidiary has been disregarded in a wide range of corporate matters." *Esmark, Inc. v. N.L.R.B.*, 887 F.2d 739, 753 (7th Cir. 1989).

UCH is the parent company of its subsidiary United (PRUSF ¶ 3) so, in order for UCH to be liable for United's actions, the Shebleys must demonstrate that the legal separateness of UCH and United has been disregarded. There are two ways a party may urge a court to disregard the corporate entity: by arguing for piercing of the corporate veil under an alter ego theory or by arguing an agency liability theory. *Binder v. Bristol-Myers Squibb, Co.*, 184 F. Supp. 2d 762, 772 (N.D. Ill. 2001) (citing *Phoenix Canada Oil Co. v. Texaco, Inc.*, 658 F. Supp. 1061, 1084 (D. Del. 1987). "The applicable state law to evaluate piercing the corporate veil is the state of

17

y

incorporation whose veil is sought to be pierced." *Fuller v. Midland Credit Mgmt. Inc.*, No. 11 C 5111, 2014 WL 883757, at *6 (N.D. Ill. Mar. 6, 2014) (citing *On Command Video Corp. v. Roti*, 705 F.3d 267, 272 (7th Cir. 2013)). Since UCH appears to have been incorporated in Delaware, Delaware law applies to the issues of alter ego and agency theory.[8] Under Delaware law, alter ego theory requires that the corporate structure cause fraud or similar injustice. *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999). "Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud." *Wenske v. Blue Bell Creameries, Inc.*, No. CV 2017-0699-JRS, 2018 WL 3337531, at *15 (Del. Ch. July 6, 2018) (quoting *Cencom*, 752 A.2d at 1184).

      The Shebleys mention the alter ego theory at points in their response to UCH and United's motion but fail to argue in any way that UCH exists solely as a vehicle for fraud, as required for veil-piercing. Instead, the Shebleys contend that UCH *may* be an alter ego of United and note that UCH and United have not submitted evidence to show otherwise. But such "speculation" and "conjecture" does not create the reasonable inference that UCH is a sham corporation. *Fitzgerald*, 707 F.3d at 730. Nor is the burden on UCH or United to demonstrate that the two entities should remain separate. Rather, the Shebleys bear the burden of satisfying the alter ego doctrine to allow for veil-piercing against the presumption of parent-subsidiary separateness. *See, e.g.*, *Wenske*, 2018 WL 3337531 at *15 (stating that party arguing for veil-piercing fell short of alleging alter ego at motion to dismiss stage); *EBG Holdings LLC v. Vredezicht's Gravenhage 109 B.V.*, No. CIV.A. 3184-VCP, 2008 WL 4057745, at *13 (Del. Ch. Sept. 2, 2008) ("I doubt that [the party seeking veil-piercing] has met its burden of demonstrating that [the opposing party] is [the subsidiary's] alter ego . . . .").

---

[8] *See* United Airlines Holdings, Inc., Annual Report (Form 10-K) (Feb. 18, 2022), https://www.sec.gov/Archives/edgar/data/0000319687/000010051722000009/ual-20211231.htm.

Alternatively, under an agency theory, "the issue of liability rests on the amount of control the parent corporation exercises over the actions of the subsidiary." *Phoenix*, 658 F. Supp. at 1084. Liability attaches only if the parent dominates activities of the subsidiary. *Id.* "[P]roof of agency within the context of a parent-subsidiary relationship requires that the plaintiff demonstrate that the agent was acting on behalf of the principal and that the cause of action arises out of that relationship." *Jurimex Kommerz Transit G.M.B.H. v. Case Corp.*, 65 Fed. Appx. 803, 808 (3d Cir. 2003) (internal quotation marks omitted).

The Shebleys have vaguely articulated an argument based on agency theory, but they set forth no evidence that UCH in any way dominated United such that United is UCH's agent. In passing, the Shebleys argue that UCH *may* have some control over the actions of United since UCH is its owner and operation, but the Shebleys present no evidence of this control. Nor do the events at hand point to UCH having any particular control over United's actions. As with the alter ego doctrine, the Shebleys fail to present evidence that United is UCH's agent for agency theory to apply.

Given UCH's lack of direct involvement in the Shebleys' removal and the Shebleys' lack of evidence to satisfy an alter ego or agency theory, UCH cannot be held liable for any of United's actions here.

## CONCLUSION

For the reasons stated above, Defendant SkyWest's motion for summary judgment (Dkt. No. 157) and Defendants UCH and United's motion for summary judgment (Dkt. No. 162) are granted. The Clerk will enter Judgment in favor of Defendants.

ENTERED:

Dated: September 30, 2023

Andrea R. Wood
United States District Judge